UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-62233-CIV-COHN/SELTZER

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CHRISTOPHER LAWRENCE, individually
and d/b/a LBS TAX SERVICES and TAX
MON$TER, INC.; and KENNETH AIKENS,
individually and d/b/a TAX PROS, TAX
PRO OF SWEETWATER, LLC, TAX PRO
AIDE, LLC, TAX PROS SUB SERIES, LLC,
and TAX PRO CORAL GABLES, LLC,

    Defendants.
_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Kenneth Aikens's Motion for Summary Judgment [DE 74] ("Motion"). The Court has carefully reviewed the Motion, along with all filings supporting and opposing the Motion, and is otherwise fully advised in the premises.

**I.**    **Background**

    **A.**    **Material Facts**[1]

---

[1] These facts are based on the parties' statements of material facts and the exhibits to those statements. See DE 75–76 (Def. Kenneth Aikens); DE 83 (Pl. United States of America). After responding fully to Aikens's statement, the Government's statement sets forth many more facts concerning alleged unlawful conduct by Aikens. See DE 83 at 4-13. But Aikens does not specifically address those facts in his Reply. See S.D. Fla. L.R. 56.1(a). All material facts recited by the United States, supported by the record, and not properly controverted by Aikens are deemed admitted for purposes of the Motion. Cf. S.D. Fla. L.R. 56.1(b). More, the Court views the facts in the light most favorable to the United States—the nonmovant—and gives it the benefit of all reasonable inferences. See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).

From 2011 to 2013, Defendant Kenneth Aikens formed three Florida limited-liability companies to operate two tax-preparation stores in the Miami area: Tax Pro Aide LLC ("TP Aide"), Tax Pro of Sweetwater LLC ("TP Sweetwater"), and Tax Pros Sub Series LLC ("TP Sub Series"), a successor company to TP Sweetwater (together, the "Aikens Firms").[2] Aikens wholly owned TP Aide. He maintains, however, that Defendant Christopher Lawrence was a partner in TP Sweetwater and TP Sub Series, and was entitled to 40 percent of those firms' net profits. The Government disputes this claim, offering evidence that Aikens was the sole owner of both companies.

In 2014 and 2015, Aikens also invested in two other tax-preparation businesses: Tax Pro Coral Gables LLC ("TP Gables"), a Florida limited-liability company with a store located in Coral Gables; and Tax pro aide LLC ("TP Decatur"), a Georgia limited-liability company with a store in Decatur, Georgia. Aikens's investments in these firms granted him 40 percent of TP Gables's net profits and 50 percent of TP Decatur's net profits. Aikens never met with any customers of TP Gables or TP Decatur, prepared or reviewed any tax returns filed for their customers, or had access to either firm's customer files. But he did provide DP Decatur with written materials for preparers' use, set the fees that the store charged its customers, answered tax-preparation questions from the store's manager (Aikens's cousin), and communicated daily with the manager about the store's operations.

All five tax-preparation businesses in which Aikens had an financial interest (together, "the TP Firms") contracted with a third-party company, EPS Financial ("EPS"), to process payments from customers and disburse tax refunds to them.

---

[2] All three of the Aikens Firms are now dissolved.

Generally, customers did not pay preparation fees directly to the TP Firms. Instead, EPS deducted the appropriate fee from each customer's tax refund (which most customers received), remitted the fee to the TP Firms, and disbursed the refund balance to the customer. Some customers, though, paid their fees directly to Aikens.

According to the Government, "Aikens and his businesses have prepared more than 5,000 returns since 2011." DE 76-7 at 4 (United States' Resp. to Kenneth Aikens' First Set of Interrogs. to the United States, Interrog. No. 4). Aikens declares that he did not sign, prepare, or review any of these 5,000-plus returns. In contrast, the United States presents testimony that Aikens did prepare tax returns for customers but masked this activity by using Preparer Tax Identification Numbers belonging to others. Further, this testimony reflects that Aikens remotely logged into employees' computers to view the tax returns they prepared, and that he filed returns prepared by employees.

Aikens denies ever training the TP Firms' employees, claiming that they were trained to prepare tax returns by a third-party vendor. But the United States offers ample testimony that Aikens personally trained employees. Indeed, these witnesses state that, for the Aikens Firms, he hired tax-return preparers who had no experience preparing tax returns. According to one employee, Aikens said that he preferred preparers who "had never done tax returns because he wanted to teach us his way." DE 83-1 at 13 (Dep. of Demissa Rodriguez).

Most important here, the Government's evidence shows that Aikens trained workers extensively on how to prepare false or fraudulent tax returns. The unlawful practices that Aikens allegedly taught employees, and how the workers used those methods in preparing and filing tax returns, include the following:

3

Aikens instructed employees to falsify tax returns so that customers would receive large refunds based on the earned-income tax credit ("EITC" or "EIC").[3] To help preparers claim the largest EITC possible, Aikens gave all of them an "Earned Income Chart" showing the income ranges that would provide customers the maximum EITC. See DE 83-44. Aikens told preparers that they should manipulate customers' incomes to fall within the ranges on the chart, in order to produce large—but illegal—refunds. Preparers used this chart "[a]lmost every time" they prepared a tax return. DE 83-2 at 8 (Dep. of Ediley Pedroso Roman); see DE 83-3 at 3, ¶ 10 (Decl. of Jessica M. Urdaneta). To place customers' incomes within the maximum-EITC ranges, Aikens trained workers to report false profits or losses for fake businesses on tax returns. One preparer estimated that employees at her store falsified returns in this manner "[p]robably about 90 percent of the time." DE 83-1 at 29 (Rodriguez Dep.).

In addition, Aikens taught preparers to maximize customers' EITC by fabricating household-help ("HSH") income. "HSH income, which is income earned from working in someone else's home, is not very commonly reported." United States v. Barber, 591 F. App'x 809, 813 (11th Cir. 2014) (per curiam). Those who employ household help must file a form with the IRS reporting wages paid to the employees if those wages

---

[3] As the Government explains,

> The EITC is a refundable tax credit available to certain low-income working people. The amount of the credit is based on the taxpayer's income, filing status, and claimed number of dependents. "If a taxpayer's EIC exceeds total tax liability, the overage is sent to the taxpayer as a refund. EIC rises with the taxpayer's income, reaches a plateau, and then falls back to zero as the taxpayer's income continues to rise." United States v. Statin, 367 F. App'x 492, 497 (5th Cir. 2010).

DE 82 at 3 n.3; see *Earned-Income Tax Credit*, Black's Law Dictionary (10th ed. 2014).

exceed a certain amount.  See DE 83-18 at 4, ¶ 10 (Decl. of Betsy Charlton).  Neither Aikens nor the employees he trained understood what income actually qualified as HSH income.  Nevertheless, at Aikens's direction, the preparers reported fictitious HSH income to give customers the largest EITC possible.

Aikens also directed employees to make up education expenses on customers' tax returns so that they could claim the American Opportunity Credit.  That credit is available only for certain expenses, including tuition and fees, incurred by a taxpayer, the taxpayer's spouse, or the taxpayer's dependents, to attend college or receive other post-secondary education.  For those who owe no taxes, the credit can entitle them to a refund.  See generally 26 U.S.C. § 25A(i).  Schools must issue informational returns to the IRS and their students showing tuition and fees paid by the students.  See 26 C.F.R. § 1.6050S-1.  Aikens instructed preparers to ignore these requirements and falsify customers' tax returns so they could claim the credit.  Indeed, Aikens told employees to give the credit to any customer who was age 26 or younger, even if the customer did not attend school.  Preparers would simply pick nearby schools when filling out the false tax returns.

Too, Aikens trained preparers to create fake deductible items, such as medical expenses and unreimbursed employee expenses.  Aikens required workers to complete a Form Schedule A, used to claim certain deductions, for customers with incomes over $33,000.  He directed employees to make up numbers for the fraudulent deductions.  To avoid raising suspicion, Aikens told preparers to fabricate numbers only up to a certain amount of the customers' incomes.

Aikens gave workers a step-by-step guide to prepare tax returns.  See DE 83-45.  Step 12 tells preparers to "CHECK FOR EIC, IF NONE YOU NEED TO KNOW WHY."

5

<u>Id.</u> Step 13 then adds, "\*\*\*\*\*\*\*\*IF NEEDED TAKE CARE OF THE CUSTOMER\*\*\*\*\*\*\*\*\*." <u>Id.</u> Based on Aikens's training, employees understood this to "mean[] that we would have to play with the numbers so they can get the maximum refund." DE 83-2 at 31 (Roman Dep.).

Consistent with Aikens's training, preparers routinely filed false or fraudulent tax returns for customers. Fourteen customers testified that preparers in the Florida offices of TP Aide and TP Sub Series placed false items on the customers' tax returns without their knowledge. <u>See</u> DE 83 at 8-10, ¶ 25 (chart summarizing items). Those stores also filed 71 tax returns for tax years 2012–2014 claiming a fuel-tax credit. That credit is available only to taxpayers who operate farm equipment, professional fishing or whaling boats, or other off-highway business vehicles. <u>See</u> <u>generally</u> 26 U.S.C. § 6421. Customers of the Aikens Firms' stores testified that, without their knowledge, preparers added false claims on tax returns for buying thousands of gallons of gasoline for "off-highway business use." <u>E.g.,</u> DE 83-13 at 4 (Interview of Lazaro Gomez).

For tax years 2012–2014, the Aikens Firms' stores filed a total of 1,923 tax returns containing at least one of the following: (1) a refundable education credit without a corresponding informational return filed with the IRS by a college or similar institution, (2) an EITC based on household-help income without a corresponding form filed with the IRS by an employer, (3) an EITC based on losses from a business that reported no gross income but $10,000 or more in expenses, or (4) a refundable fuel-tax credit. <u>See</u> DE 83-18 at 3-5 (Charlton Decl.). For preparing these returns, Aikens's companies received fees totaling $914,853. <u>See</u> <u>id.</u> at 5.

By falsifying returns to get customers larger refunds than they were entitled to, Aikens's businesses could, and did, charge higher preparation fees. Indeed, there was

6

a direct correlation between the refund and fee amounts. And as owner of the Aikens Firms, Aikens was entitled to most or all of the firms' earnings. So for tax purposes, income generated from these businesses flowed through to Aikens as his own income. For example, on Schedule Cs for tax years 2013 and 2014, Aikens reported gross receipts of $440,832 from TP Sweetwater's predecessor company and $724,701 from TP Aide.

### B. Procedural History

On October 22, 2015, the United States brought this action against Aikens, individually and doing business as the TP Firms. See DE 1 (Compl.).[4] Citing the alleged conduct described in Part I.A, the Complaint asserts claims under 26 U.S.C. § 7407 (Count I), 26 U.S.C. § 7408 (Count II), and 26 U.S.C. § 7402(a) (Count III). All three claims seek injunctive relief that would essentially bar Aikens from any involvement in preparing federal tax returns. Also, Count III requests disgorgement of the fees that Aikens and his businesses received for the preparation of false or fraudulent tax returns.

Aikens moved to dismiss the Complaint for failure to plead fraud with sufficient particularity, see Fed. R. Civ. P. 9(b), and failure to state a valid claim for disgorgement, see Fed. R. Civ. P. 12(b)(6). See DE 14. The Court denied that motion. See DE 35. Aikens then answered the Complaint and pleaded affirmative defenses. See DE 40.

Following discovery—which involved several contested motions—Aikens filed his present Motion. See DE 74. The Motion seeks summary judgment on Count I and the

---

[4] The Complaint also named Christopher Lawrence as a Defendant. See id. After Lawrence failed to respond, default was entered against him. See DE 20. On the Government's motion, the Court recently entered a Judgment and Order of Permanent Injunction and Disgorgement against Lawrence. DE 90.

portion of Count III requesting disgorgement. The Government has filed a Response opposing the Motion, and Aikens has filed a Reply. See DE 82; DE 89. The parties have also filed factual statements, supporting evidence, and supplemental authority. See DE 75–76; DE 83; DE 87.

## II.     Discussion

### A.     Summary Judgment Standards

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must demonstrate that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.

If the movant makes this initial showing, the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmovant "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

Essentially, so long as the nonmoving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker, 911 F.2d at 1577.  If the evidence advanced by the nonmovant "is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).

A court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In so doing, the court must view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor. See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  The court also must discern which issues are material:  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.

### B. Analysis of Defendant's Motion

#### 1. Disgorgement Under § 7402(a)

The Court will first address Aikens's request for summary judgment on the disgorgement claim in Count III.  This claim is based on 26 U.S.C. § 7402(a), which allows district courts to "make and issue in civil actions, writs and orders of injunction . . . and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws."  26 U.S.C. § 7402(a).  The Eleventh

9

Circuit has rejected a "narrow construction of § 7402(a)," emphasizing that the statute's language "encompasses a broad range of powers necessary to compel compliance with the tax laws." United States v. Ernst & Whinney, 735 F.2d 1296, 1300 (11th Cir. 1984).

As this Court recognized in denying Aikens's earlier dismissal motion, the remedies authorized by § 7402(a) include disgorgement. See DE 35 at 7 ("Multiple district courts in the Eleventh Circuit have held that disgorgement is an available remedy under 26 U.S.C. § 7402." (citations omitted)). "Disgorgement is an equitable remedy intended to prevent unjust enrichment." SEC v. Monterosso, 756 F.3d 1326, 1337 (11th Cir. 2014) (per curiam). The Government "has the burden of proving the disgorgement figure reasonably approximates the amount of unjust enrichment." CFTC v. Sidoti, 178 F.3d 1132, 1138 (11th Cir. 1999). The proper measure disgorgement is the amount of gross revenues that the defendant received from the wrongful conduct— not his net profits. See, e.g., FTC v. Washington Data Res., Inc., 704 F.3d 1323, 1327 (11th Cir. 2013) (per curiam). This is because "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." Id. (quoting FTC v. Bronson Partners, LLC, 654 F.3d 359, 375 (2d Cir. 2011)).

In an earlier discovery response, the Government stated that it sought to disgorge from Aikens a total of $2,839,232.02. See DE 76-9 at 3 (United States' Resp. to Kenneth Aikens' Second Set of Interrogs. to the United States, Interrog. No. 2). This amount included fees that Aikens received through all five TP Firms for various tax years spanning 2013 to 2016. See id. The Government, though, has now "revised its claim for disgorgement downward" to $914,853. DE 83 at 4, ¶ 14; see id. at 11, ¶ 28. As described in Part I.A. above, this is the total amount of fees paid to the Aikens Firms

for preparing 1,923 returns, in tax years 2012–2014, that include at least one of four items consistent with Aikens's alleged fraudulent practices.

Aikens contends that the Government's identification of these returns cannot prove that they were all fraudulent or that Aikens was aware of any such fraud. Thus, Aikens asserts, the Government may not seek to disgorge the fees paid for the returns. The Court disagrees.[5]

The Government has presented evidence that Aikens routinely trained his stores' preparers to maximize customers' tax refunds by adding false or fraudulent information to their returns. Aikens gave every employee a chart showing the income ranges necessary to maximize customers' EITC, and directed workers to fabricate certain credits, deductions, and earnings to shoehorn the claimed income into those ranges. The preparers carried out these instructions, placing made-up information on customers' returns—often without their knowledge—and filing the false returns. More,

---

[5] The parties dispute whether the Government must prove fraud to seek disgorgement from Aikens here. The Court need not decide that issue for purposes of the Motion because, as discussed herein, there is more than sufficient evidence to show that Aikens obtained tax-preparation fees through fraudulent means. See Carlson v. United States, 754 F.3d 1223, 1226 (11th Cir. 2014) ("[T]he Government must prove fraud in civil tax cases by clear and convincing evidence.").

Further, in his Reply, Aikens argues that the Government failed to identify in discovery responses the 1,923 tax returns underlying the reduced disgorgement claim, and therefore that these returns should be excluded. See Fed. R. Civ. P. 37(c)(1). Although the United States has not had a chance to respond to this argument, the Government asserts in its factual statement that it "will supplement its discovery responses accordingly." DE 83 at 4, ¶ 14; see Fed. R. Civ. P. 26(e)(1)(A). In any event, the Government has filed in the record charts identifying each taxpayer for the 1,923 returns, where each return was prepared, the specific tax items in question, and the amount of fees paid to prepare the return. See DE 83-38–83-40 (Exs. U–W to Charlton Decl.). Aikens has also addressed the disputed returns in his Reply, taking the position that they do not provide the necessary proof of fraud. See DE 89 at 2-3. For these reasons, any unjustified late disclosure of the returns by the Government was harmless and does not warrant the returns' exclusion. See Fed. R. Civ. P. 37(c)(1).

the customers' illegally enhanced refunds produced greater fees for Aikens's, revenues that personally—and unjustly—enriched him.  If proven at trial, this fraudulent course of conduct would permit disgorgement of Aikens's ill-gotten gains.

Further, in view of the specific misconduct allegedly orchestrated by Aikens, the fees he obtained from the 1,923 tax returns identified by the Government yield a "disgorgement figure [that] reasonably approximates the amount of unjust enrichment." Sidoti, 178 F.3d at 1138.  As the United States explains,

> This is a reasonable—and conservative—estimate of Aikens's ill-gotten gains.  First, it addresses returns only from the two stores in Florida that Aikens admits to owning.  Second, it focuses almost exclusively on specific types of claims that preparers testified to routinely fabricating per specific instructions from Aikens.  Third, it focuses exclusively on the types of claims that multiple customers have testified were falsified on their returns.  Fourth, it cross references other IRS materials to eliminate any "false positives."  Fifth, it includes Schedules C only for customers who claimed an EITC based on a business that reported $0 in gross receipts and over $10,000 in expenses.  Thus, it includes only those claims that are facially unreasonable, should have been filtered out by due diligence, and reflect the type of abuse about which preparers and customers have testified.

DE 82 at 14 (footnotes omitted).  In sum, the Government's evidence would allow a reasonable finder of fact to conclude that the preparation fees for all or most of these returns unjustly enriched Aikens.  See id.[6]

Aikens also maintains that the United States cannot obtain disgorgement from him because customers paid his companies, not him personally, for tax preparation. Further, Aikens points out that the Government has not joined any of the companies as

---

[6] The specific amount of disgorgement, if any, will be established at trial. See id.; DE 35 at 8.

12

Defendants in this action. This argument misses the point. The claim for disgorgement is an equitable one that seeks to divest Aikens of the funds he personally received from operating his tax-preparation firms in an unlawful manner. By allegedly using the companies he owned as "a conduit for improper and fraudulent tax return preparation," DE 82 at 18, Aikens was unjustly enriched and may be ordered to disgorge those gains. See 26 U.S.C. § 7402(a); Ernst & Whinney, 735 F.2d at 1300; Monterosso, 756 F.3d at 1337. The Court will therefore deny Aikens's request for summary judgment on the disgorgement claim.

### 2. Injunctive Relief Under § 7407

Aikens next contends that he is entitled to summary judgment on Count I, which seeks injunctive relief based on 26 U.S.C. § 7407. Section 7407(a) permits "[a] civil action in the name of the United States to enjoin any person who is a tax return preparer from further engaging in any conduct described in subsection (b) or from further acting as a tax return preparer." 26 U.S.C. § 7407(a). The Internal Revenue Code defines "tax return preparer" as "any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed by this title or any claim for refund of tax imposed by this title." 26 U.S.C. § 7701(a)(36).

Aikens claims that § 7407 does not apply to him because he is not a tax return preparer. According to Aikens, no competent evidence shows that he prepared any tax returns, and the workers who prepared returns for his companies were employed by those firms and not by Aikens personally. The Court rejects this contention.

The record contains testimony that Aikens prepared tax returns for customers but masked this activity by using Preparer Tax Identification Numbers belonging to

13

others.  Although Aikens tries to minimize and cast doubt on this testimony, it still creates a triable issue of fact.  Regarding Aikens's claim about his firms' employees, this Court is persuaded by the reasoning of another court faced with a similar argument:

> [T]he Court finds that Stinson—by virtue of his ownership and operation of tax return preparation stores and his employment of individuals to assist in tax preparation—is a tax return preparer.  Stinson owned and operated the tax preparation stores, hired employees, trained employees, and profited from his tax preparation business.  He cannot now disclaim any involvement with tax preparation.

United States v. Stinson, Case No. 6:14-cv-1534-Orl-22TBS, slip op. at 11 (M.D. Fla. Aug. 26, 2016) (provided at DE 87-1).  The Court will thus deny Aikens's Motion with respect to Count I as well.

### III.   Conclusion

Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant Aikens's Motion for Summary Judgment [DE 74] is **DENIED.**

2. Trial remains set to begin on **October 11, 2016, at 9:00 a.m.**  See DE 88. Because the claims and remedies at issue are strictly equitable in nature, the case will be tried before the Court rather than to a jury.

3. Although the parties apparently planned to hold a mediation conference by the August 5, 2016, deadline (see DE 39, 70-71), no mediation report has been filed. See DE 22 at 3, ¶ 10 (Order Requiring Mediation).  And while the parties' continued litigation of this case indicates that no settlement was reached, the Court must ensure that the parties timely and properly mediated their dispute. Therefore, by **October 4, 2016,** the parties shall file a joint status report

concerning their mediation conference, including the date of the conference, the attendance of required persons, and the results of the mediation.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 27th day of September, 2016.

_____
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF